# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **WESLEYANN & WARREN GILL,** Parents and Next Friends of W.G., Plaintiffs, v. DISTRICT OF COLUMBIA, Defendant. | **Civil Action No. 09-1608 (RMC)** |

## MEMORANDUM OPINION

W.G. is a special needs child who receives special education and related services from the District of Columbia Public Schools.  From November 5, 2008 to March 11, 2009, W.G. was not provided a Free Appropriate Public Education ("FAPE"), as required by the Individuals with Disabilities Improvement Education Act.  Because Plaintiffs presented insufficient evidence from which the Hearing Officer  could determine whether, and to what extent, compensatory education should be provided to W.G.,  no compensatory education was ordered.  Sitting in equity, this Court ordered an evidentiary hearing to fill that void.  *See* Mem. Op. [Dkt. # 21]; Order [Dkt. # 22].  Plaintiffs have not persuaded the Court that they have a program that would compensate W.G. for an educational loss, if any, he suffered in 2008-09.  Their appeal will be denied and dismissed.

## I.  FACTS

W.G. faces significant challenges.  He is twenty years old, with an IQ of 51 and adaptive skills that range from those of a baby of seven months to a boy of eight and one-half years.  Pls.' Hearing  Ex. 2 (Neuropsychological Evaluation June 29, 2009) at 9.  His basic receptive and

expressive language skills are at an age equivalent of approximately five years. *Id*. at 6. His education advocate, Maria Consuelo Ortega, testified that both his cognitive skills and his working memory are in the severely low range. *See also* Pls.' Hearing Ex. 3 (Educational Evaluation Sept. 15, 2009). In his personal care — bathing, dressing, combing his hair — W.G. is like an eight year old; in his other daily living skills, he functions between age equivalents of 3 years, 11 months, and eight years, six months. Pls.' Hearing Ex. 2 at 9. After tests in the fall of 2008, W.G. was classified as mentally retarded and emotionally disturbed. *Id*. at 3. When he had a psychological evaluation in June 2009, W.G. was diagnosed as bipolar, suffering from paranoia and social anxiety. Id. at 9, 10, 12. An educational evaluation in September 2009 concluded that his "academic knowledge is negligible," "his academic skills are negligible," and his "ability to apply his academic skills is negligible." Pls.' Hearing Ex. 3 at 1.

W.G. attended the SunRise Academy in Washington, D.C. during the 2007-2008 and part of the 2008-2009 school years. At a multi-disciplinary team meeting on March 4, 2009, W.G.'s education advocate complained that SunRise was an inappropriate placement and asked for W.G. to be transferred. After initially rejecting the request, on approximately March 11, 2009, the District of Columbia agreed and transferred W.G. to the Leary School in Prince George's County. W.G.'s parents seek compensatory education for the time between W.G.'s re-classification as mentally retarded and emotionally disturbed on November 5, 2008 and his transfer to Leary on March 11, 2009.

After a due process hearing on W.G.'s complaint that his education was lacking and he should be awarded compensatory education, the Hearing Officer found that he had been denied a Free Appropriate Public Education but refused to award any compensatory education because

Plaintiffs had failed to present fact-specific evidence to justify the award of 150 hours of compensatory education that they requested. On appeal, this Court upheld the finding of denial of a FAPE and, sitting in equity, set the matter for an evidentiary hearing to allow Plaintiffs to offer the necessary evidence to support their claim for compensatory education. *See* Mem. Op. [Dkt. # 21]; Order [Dkt. # 22].

That hearing was held on February 1, 2011.[1] Plaintiffs called Ms. Ortega, the education advocate who was also their sole witness before the Hearing Officer. Ms. Ortega is employed by Plaintiffs' counsel's law firm.[2]

Ms. Ortega testified that W.G. has been schooled at the National Children's Center since December 2009. He is now 19 years old and is entitled to special education services in he District of Columbia until he turns 22. He cannot read or write, although he can copy some letters as long as they are big enough. He does not recognize the alphabet. He can count from zero to ten. He has a memory deficit that requires constant repetition, on a daily basis, for him to retain new skills. He can stack chairs and wash dishes, but even so, this requires a dedicated aide to assist him.

W.G. was absent from school on numerous occasions in 2008. *See* Pls.' Hearing Ex. 2 at 9. He was hospitalized for two weeks at Children's Hospital in February 2008. *Id*. Due to his frequent truancy, his mother was investigated by Child Protective Services in 2008 and truant officers were utilized to improve his attendance. *Id*.

As she did in the administrative hearing, at the evidentiary hearing before this Court,

---

[1] The parties also filed post hearing briefs. See Pls.' Post Hearing Br. [Dkt. # 26]; Def.'s Resp. [Dkt. # 27].

[2] Although Ms. Ortega testified to her background, training and experience, Plaintiffs did not offer her as an expert witness and the Court did not accept her as one.

Ms. Ortega recommended 150 hours of compensatory education for W.G. She suggested it could be provided as life skills training by Future Leaders of America, a non-profit organization, during the summer, since W.G. cannot absorb more than he is already presented at National Children's Center. *See* Pls.' Hearing Ex. 1 (Life Skills Plan developed for W.G. by Future Leaders of America). The Life Skills Plan developed for W.G. states that the plan "will put [W.G.] on the correct path to gain more social awareness, [and provide] effective life skills training with meaningful experiences that help [W.G.] to develop his independent living skills." *Id.* at 1. The life skills in question are "Traveling (i.e., Metro Bus/Rail, Taxi, and Amtrak), Public Safety, 'Real Life' Math, Community Service, Obtaining Appropriate Identification, Employment Etiquette, and Job Training." *Id.* The "resource material" used by Future Leaders of America "is Life Skills Activities for Secondary Students with Special Needs for ages 5-18." *Id.* at 3.

The Life Skills Plan for W.G. contains an outline of a completed lesson with the objective of having a student "explain how a person with a disability could make adaptations to do well in school or on the job." *Id.* Its introductory activity is to "[h]ave students make a list of disabilities with which they are familiar." *Id.* Its next activity is to have students "read five examples on the worksheet 'Working with a Disability' about people with disabilities in a school or work situation." *Id*. at 4. The Plan gives examples of "Life Skill Descriptors" such as (1) "planning a trip" in which the student lists a place he would like to go and lists three cost considerations and (2) "local transportation" in which the student lists ways people travel in the city, identifies one way and then lists an alternative, and finally lists three forms of transportation and how the student or his family member use them and lists ten places the student would like to go. *Id*. at 3. The Life Skills Plan also identifies various services and their costs, such as a trip to the National

Aquarium in Baltimore on a Marc Train; trips on Metrorail in the District of Columbia to various venues; use of a taxi cab; and grocery shopping, for which "Student will devise grocery list and make a purchase (ex. $20 can feed a family of six)." *Id.* at 4-5. The Plan indicates that it will "provide optimal opportunity for the student to take trips outside of his/her neighboring community, conduct research at the Martin Luther King Public Library, as well as utilize public transportation." Pls.' Hearing Ex. 1 at 5.

## II. LEGAL STANDARDS

The Individuals with Disabilities Education Improvement Act of 2004 ("IDEIA"), 20 U.S.C. § 1400 *et seq*., ensures that, "all children with disabilities have available to them a free appropriate pubic education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A). The IDEIA guarantees children with disabilities the right to a free appropriate public education, i.e. FAPE. *Id*. In designing an appropriate education for students with disabilities, the child's parents, teachers, school officials, and other professionals collaborate to develop an individualized educational program ("IEP") to meet the child's unique needs. *See* 20 U.S.C. § 1414(d)(1)(B) & (d)(2)(A). Local school officials utilize the IEP to assess the student's needs and assign a commensurate learning environment. *See* 20 U.S.C. § 1414(d)(1)(A). The IEP team, consisting of the student's parents, teachers, and other local education personnel, examines the student's educational history, progress, recent evaluations, and parental concerns prior to implementing a FAPE for the student. *Id*. To determine whether a FAPE has been provided, courts must determine whether: (1) the school complied with the IDEIA's procedures; and (2) the IEP developed through those procedures was reasonably calculated to enable the student to receive

educational benefits. *Loren F. v. Atlanta Indep. Sch. Sys.*, 349 F.3d 1309, 1312 (11th Cir. 2003).

While the District of Columbia is required to provide students with a public education, it does not guarantee any particular outcome or any particular level of education. *Bd. of Educ. of Hendrick Hudson Central Sch. Dist. v. Rowley*, 458 U.S. 176, 192 (1982); *Dorros v. District of Columbia*, 510 F. Supp. 2d 97, 100 (D.D.C. 2007). If the parent objects to the identification, evaluation, or educational placement of the student, or the provision of a free appropriate public education, 20 U.S.C. § 1415(b)(6), the parent may seek an impartial due process hearing. *Id*. § 1415(f)(1). If the parent is dissatisfied with the outcome of that hearing, s/he may appeal the decision to a state court or a federal district court. *See* 20 U.S.C. § 1415(i)(2)(A).

In evaluating a hearing officer's decision in an IDEIA case such as this one, a court reviews the administrative record, may hear additional evidence, and bases its decision on the preponderance of the evidence, granting such relief as deemed appropriate. 20 U.S.C. § 1415(i)(2)(C). The court gives "due weight" to the decision of the hearing officer and does not substitute its own view of sound educational policy for that of the hearing officer. *See Rowley*, 458 U.S. at 206. Moreover, the burden of proof is with the party challenging the administrative determination, who must "'at least take on the burden of persuading the court that the hearing officer was wrong.'" *Reid v. District of Columbia*, 401 F.3d 516, 521 (D.C. Cir. 2005) (quoting *Kerkam v. McKenzie*, 862 F.2d 884, 887 (D.C. Cir. 1988)).

The Circuit set out the standards for an award of compensatory education in *Reid.* "Under the theory of 'compensatory education,' courts and hearing officers may award 'educational services . . . to be provided prospectively to compensate for a past deficient program.'" *Id*. at 522 (citations omitted). Remedying the deprivation of FAPE "carries a qualitative rather than

quantitative focus." *Reid*, 401 F.3d at 524. "[A]wards compensating past violations [must] rely on individualized assessments." *Id.*

> In every case . . . , the inquiry must be fact-specific and, to accomplish IDEA's[3] purposes, the ultimate award must be reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place.

*Id.* In addition, "whereas ordinary [Individual Education Plans] need only provide 'some benefit,' compensatory awards must do more — they must *compensate*." *Id.* at 535. When a student challenges the lack of an award of compensatory education for a FAPE, "the parties must have some opportunity to present evidence regarding [the student's] specific educational deficits resulting from his loss of FAPE and the specific compensatory measures needed to best correct those deficits." *Id.* at 526. The Court can "requir[e] DCPS to offer proof that the placement compensated for prior FAPE denials in addition to providing some benefit going forward." *Id.*

The Court held an evidentiary hearing in this case on February 1, 2011, for the purpose of determining W.G.'s specific educational deficits resulting from his loss of FAPE and the specific compensatory measures needed to best correct those deficits.

### III. ANALYSIS

Unlike *Reid,* which involved a multi-year denial of a FAPE, in this instance, W.G. suffered from uncertified teachers and classes beyond his ken for a period of only four months. During that same time period, he was in a school dedicated to special education students, as required

---

[3] On December 3, 2004, the Individuals with Disabilities Education Act ("IDEA") was amended by the IDEIA. The IDEIA became effective July 1, 2005. *See* Pub. L. 108-446, 118 Stat. 2647 (2004). The differences between the old and the new statutes are not relevant for the purpose of this Memorandum Opinion.

by his IEP; received social and psychological counseling; had a small student-teacher ratio in his classes; and received behavioral and clinical support from experts. Thus, he was not deprived in whole of all the advantages of special education for special needs students. Currently, he has an Individual Education Plan that is geared to his limited abilities. He received job training at the National Children's Center last summer and is now working at two different places, on a transition plan to adult life. Such training should allow him to "age out" of special education at 22 years of age and move to oversight by the Department of Disability Services, most probably at a group home. In other words, W.G. is receiving a FAPE now and has been since March 2009. Plaintiffs do not suggest otherwise.

The question is what specific educational deficits resulted from the four-month loss of a FAPE in 2007-2008? Plaintiffs do not answer this question. Ms. Ortega could identify problems with W.G.'s education at SunRise: non-certified teachers and classes in English grammar, chemistry, and algebra well beyond his abilities. She also identified a program of life and job skills training that she prefers, to prepare W.G. to live in a group home as an adult. The unstated connection appears to be that W.G.'s abilities are in the severely low range and classroom education does not provide the kind of training for life that Ms. Ortega believes is necessary. Since, however, Ms. Ortega was not admitted as an expert witness, her opinion alone is inadmissible to prove anything.[4]

---

[4] Ms. Ortega asserts that W.G.'s extensive truancy at SunRise arose from his social anxiety and was not his fault. Even presuming this to be the case, his hospitalization and frequent absences are not traceable to the denial of a FAPE and his absences undercut his claim for compensatory education. This pattern continues; in the period between August 23, 2010 and October 28, 2010, W.G. attended school less than half the time. *See* Def.'s Hearing Exhibits [Dkt. # 24-1] (Progress Notes) at 23. While it is clear that W.G. was denied a FAPE, the impact of that relatively-short hiatus on this particular part-time student cannot be measured and is doubtful.

Even if Ms. Ortega had been accepted as an expert, the Life Skills Plan developed by Future Leaders of America that Ms. Ortega advocates as compensatory education for W.G. fails to persuade. The Plan has no address or contact information and is unsigned. Plaintiffs have provided *no* information about the organization or the professional skills of its personnel. The Plan's content and sample lessons are vastly more complex than anything W.G. could handle. W.G. cannot "make lists," he cannot read, he cannot comprehend concepts, and he cannot "conduct research at the Martin Luther King Public Library." Pls.' Hearing Ex. 1 at 3, 5. The proposal is so distant from the current abilities of W.G. that it can only be characterized as unrealistic and unworkable.

Plaintiffs failed to support their claim for 150 hours of compensatory education before the Hearing Officer. They offered hardly any additional evidence at the evidentiary hearing in this Court, even though the hearing was called for that very purpose. Plaintiffs merely presented Ms. Ortega again as well as the sketchy and patently insufficient Life Skills Plan. Ms. Ortega indicated that her estimate of 150 hours for compensatory education was based on her professional experience but she provided no support for the claim that 150 hours was reasonable instead of, for example, 200 hours or 95 hours. The Court is in the very same position as was the Hearing Officer — due to the lack of evidentiary support, the Court is compelled to find that Plaintiffs have failed to support their claim for 150 hours of compensatory education.

## IV. CONCLUSION

Plaintiffs seek 150 hours of compensatory education in life skills training for W.G. but provide too little support for the number of hours or the value of the proposed program for this particular student. The Hearing Officer's denial of compensatory education was for the very same reasons. He was right. The Hearing Officer's decision will be affirmed and the appeal will be

dismissed.  A memorializing Order accompanies this Memorandum Opinion.


Date: March 16, 2011                                  /s/
                                         ROSEMARY M. COLLYER
                                         United States District Judge